Good morning. We have five cases on the calendar this morning. One from the Court of Federal Claims, two patent cases, one from the District Court, one from the Patent Office, a government employee case, a Veterans Benefits Appeal, and the latter two are being submitted on the argument. So our first case is Englewood Terrace v. United States, 2011, 5072 and 5073. Mr. Murray. Thank you, Your Honor, and may it please the Court. My name is Brian Murray and I represent Englewood Terrace, LP. Your Honors, this is not a routine breach of contract case. In this case, HUD, as the trial court found, without justification, cut off subsidy funding for Chicago's poor of the Englewood neighborhood. HUD really thought that they could change a contract by taking an executed copy... You mean Chicago's poor or for the project? For the project, for people living in the South Point Towers of Englewood. You don't have to color it up as if we're a jury. And I appreciate that, Your Honor. They really thought, though, that they could amend a contract by just taking a pencil and changing an executed copy. But that's not relevant here either. They haven't defended that on appeal. On appeal, the arguments they have raised as to breach are reviewed for clear error only, and we don't believe they're any more meritorious. We believe the trial court was correct as far as she went in awarding lost rental income damages. Our appeal focuses on two points, the lost equity piece that we think Englewood should have recovered, and the three pieces of lost rental income that the trial court didn't award. Starting with the lost equity, we agree that lost equity as a result of a breach of contract is unusual. There aren't a lot of cases about it. We think Markowitz from the Sixth Circuit... You said that we can't set aside our findings except for clear error, so that applies to you as well as to the government. And why are her findings with respect to the equity clearly erroneous? I agree with that, Your Honor, and I want to embrace the clear error standard here, because this case, we believe, even under the clear error standard, cries out for an award of lost equity, and here's why. In most cases, you can't get lost equity because foreseeability and causation are too attenuated. Just because the government doesn't give you its half payment, it's not clear that that's going to cause you to lose the equity in the building here. But here, the trial court found, and it's in her order, if Englewood was having difficulty even while receiving those payments, the government should have known, and it would have been foreseeable, that it could not survive without them. And the testimony and the contemporaneous documentation from four different HUD witnesses amply supported that finding. You had John Schneider, who's HUD's chief appraiser, who said the building could not survive without deep subsidy assistance. You had Freddie Batchelor, who was HUD's analyst for South Point, who said it could not continue without payments. But you have HUD insuring Englewood's mortgage in 2004. If they thought South Point would fail, why would they have insured the mortgage? I mean, the court pointed to that fact precisely. That's one of the reasons that she reached the conclusion she did. I agree, Your Honor. And as I stand here today, why it is that Hinsberger would agree to insure that mortgage, I can't tell you. What I know is no other lender, given that the four-year half contract was gone, even Mr. Hinsberger admitted no other lender would lend in those circumstances. The building was in foreclosure. The foreclosure only stopped, conditioned on HUD making that loan, and Mr. Hinsberger's whole staff told him not to do it. Mr. Hinsberger had an idea that if you build it like new, that there will be market rate payers who will come live in Englewood. It didn't work that way. Englewood couldn't survive without the half payments. That was true under the CIC mortgage. It was true when Mr. Hinsberger offered the lifeline in the form of the HUD mortgage. It was true right until the end of the contract. Apparently, the owner also thought it was possible to survive with the new financing, right? The owner, when you're faced with sure foreclosure and CIC in foreclosure in May of 2002 and nothing else to do, and HUD comes to you, the people you know you're going to have to sue, I mean especially given the mitigation arguments they made with respect to lost rental income, what are you supposed to do? When Mr. Hinsberger stands there and says, here's the only way out, take this loan, make it like new, and they will come. Had Englewood done anything other than accept that loan, we'd be here today talking about a failure to mitigate. Englewood did what it could to survive, but the truth was, just as with the first foreclosure, all the way from the beginning to the end, what was foreseeable... But this refinancing had been something that had been in the works and had been applied for years, right? Refinancing of a kind had been applied for for years. There was an earlier loan application in 1999, one again in 2004, loans in the range of $2 to $3 million. This is the fundamental disconnect. The people at Englewood were trying to take care of the REACT, the Decent, Safe and Sanitary standard required to run a HUD building. They didn't need an $11 million loan that Mr. Hinsberger came forward with to make it decent, safe and sanitary. What they needed was a smaller loan. They couldn't get that. What they got at the last minute was this $11 million offer as a lifeline. They had to mitigate their damages. There was nothing they could do. You're facing a finding by the court of federal claims that this basically was untenable to argue that this was mitigation, right? Certainly that's what she said, but if you look at the record, foreseeability under this court's case is measured from the time of the signing of the contract, and it has to be that kind of damages that is foreseeable. What has to be foreseeable is that as the court actually found, this is the tension in her ruling, she said that if it was foreseeable that Englewood wasn't doing well with these payments, they had to have known. They had to have known that it could not survive without them. Where did she say that? She said that at page 123 of Englewood 5, Your Honor. What page? Page 123 of Englewood 5. Remember, at the time of the breach, these half payments made up... 123 of the 5th file? Of what? Of Englewood 5, the opinion we cite in our brief is Englewood 5, the 5th opinion. Oh, so this is not the joint appendix? No, it's the damages opinion, Your Honor. Where do I find that? It's on the DACA default 21, but it's the damages opinion. On what page? Is it in the appendix to the blue brief? Where is it? I don't have a citation, but I stand here, Your Honor. I can get it for you. Well, you know, if you come and cite things, you ought to be prepared to show us where they are. And I apologize to the Court, Your Honor. It's on page 123 of the site, and I'll get you the site. At the time of that breach, the half payments made up more than 88% of Englewood's revenue stream. So if Englewood wasn't doing well with those payments and you take away 88% of the revenue stream, of course they're going to lose the equity. I'm quoting now. If Englewood was having difficulty, even while it was receiving half payments, it should have been foreseeable to HUD that Englewood would not be able to survive without them. That's what the Court found, and that's the tension in the opinion. What's required at the time of contracting is foreseeability of this kind of damages. And it was certainly foreseeable that if HUD cut off these payments, that Englewood would lose its equity. And that's exactly what happened. There was this intervening point where HUD came forward and insured a new loan, but it didn't change the fact that without these half subsidies, the building could not survive in a market sense, as four different HUD witnesses testified. Finally, there's the point as to, on the lost equity, as to the certainty of damages. Again, this is an unusual case. It's not typically the case that someone making a lost equity claim happens to have an MAI appraisal with the fair market value from the time of the breach. So, in this opinion at 94 Federal Claims, page 18 in the blue appendix, she says, The Court concludes that the plaintiff has failed to meet its burden of proof by not presenting sufficient evidence to show that HUD foresaw or should have foreseen that if it terminated the HAP contract, Englewood would eventually lose its equity. So, she's made a specific finding there. I agree, Your Honor. And I believe that finding is in tension with the prior point, which again, I'll get you the slide for it as soon as I sit down, where she said it should have been foreseeable that Englewood would not be able to survive without these payments. It's simple economics. If 90% of the payment stream for this building is coming from these subsidy payments, and you take away those subsidy payments, as four different HUD witnesses understood, the building can't survive without these payments. What HUD did in the meantime to come forward with a lifeline that didn't work was irrelevant. What this building needed to survive was these payments, and without these payments, as history bore out, it could not survive. As to the lost rental income errors, we agree with the Court's decision to award the lost rental income that it did. There were three smaller pieces of that rental income that we thought Englewood was also entitled to, the vacancy rate, the start date, and the rate increases. I'm happy to rest on what's in my brief on those, unless the Court has any questions. And if there aren't any further questions, I'd like to reserve my time. We will save the rest for Mr. Bowen.  May it please this Court, and thank you. We ask this Court to reverse the portion of the decision below that found HUD liable for breach of contract in the amount of $3.2 million. We ask this Court to affirm the other portions of the decision. This Court should reverse the portion that found HUD liable for breach of contract for $3.3 million for two reasons. First, the Court never found that Englewood maintained South Point in decent, safe, and sanitary condition as it was required, despite 235 days elapsing between the notice of default and HUD's eventual contract termination. Do you agree that the contract here required notice of deficiencies and the opportunity to cure before there could be a termination for default? Yes, I do, Your Honor. Okay. So I looked at the various notices that HUD sent beginning on April 9th, and they all refer to the March inspection and the deficiencies identified there. And that seems those are the only deficiencies that I see identified in those notices of default. And we have a finding by the Court of Federal Claims that those deficiencies were either corrected or on their way to correction. And how do you deal with that? We deal with that in the following way. Pursuant to the addendum to the contract, the reasonable period of time to correct them was to be determined by HUD, and they gave 30 days in this instance. Englewood had, it's not disputed that Englewood had not corrected them. Your Honor, just so that I'm sure that we're on the same page, do you agree with my assessment that the only notice of deficiencies that was given were those deficiencies growing out of that March inspection? I mostly agree, but I would qualify with this one tack on, that the April 9th notice of default was regarding the totality of the circumstances, as well as how are you going also mentioned in the March report that you've got to find a way that you're going to show you can finance these changes, that you can inspect all the units. So the March report identified a number of the changes that had been ongoing at this building for such a long period of time that HUD had finally been forced to issue the notice of default. So they confined themselves to what was in the March report? HUD, the notice on April 9th was meant to be broader, but specifically using the findings in the March report to demonstrate that they had failed to correct problems which had been endemic in South Point since 1999. Well, what's wrong with her finding that the deficiencies identified in the March report had either been corrected or that there was an appropriate plan to correct them? The March letter, the March 9th letter, specifically directed them not only to correct the deficiencies that had been identified, but also to inspect all of their units, find out what other deficiencies there were, and then submit a plan for correcting those. The court never found that it had actually corrected all the deficiencies found in the March 2001 REAC report. It said, well, there were ones that were left, those could have easily been fixed. That's not required. We are trying to protect these tenants, and thus we require them all to be fixed. Well, the CFC, as far as I can tell, received conflicting testimony on whether the deficiencies were fixed, but credited the testimony by the South Point property manager that everything was corrected within 72 hours, and then you have the HUD witness saying not everything was corrected, but she didn't expressly identify specifically what wasn't corrected, and the court said, well, that's not as helpful. If I could clarify, Your Honor, the items which the court found were corrected within the 72 hours were the exigent health and safety matters. Those are the things that could kill someone, which need to be corrected. We didn't contest that they had, in fact, there was conflicting testimony, but we're not contesting the court's finding that the exigent health and safety matters have been corrected. We're referring to the requirements that a decent, safe, and sanitary condition… Are those the ones that the architect testified to, then, or did the architect, in your view, only testify to the exigent health and safety issues? In this case, I have Ted Diné's inspection that he conducted, as the court probably found was done in November and December of 2000, four months prior to the March 2001 REAC inspection. As a result, his plans could not have been responsive to the REAC's requirement that you go through and you see what new has developed, you make sure that every unit, you've detailed everything that is wrong with that unit, and you then go back and you give us a plan for actually fixing all the other stuff we found. The REAC inspection only looked at 25 units out of 303 units. We needed them to go through and find and tell us what else needed to be inspected. Their submission, a report done months prior, could not satisfy that requirement. Additionally, we required them to demonstrate how they were going to So, if I understand what you're saying, that there are two deficiencies here. One, they didn't identify what problems might exist in the other units and they hadn't shown that they had the financing, right? Correct. And what did the Court of Federal Claims say about those two items? The Court of Federal Claims said that the submission of the plans from Ted Diné, their requirements that they inspect all the units. However, as you know, because we disagree with that, because that happened months prior to us finding all these other deficiencies. Second, on the financing, the Court made a statistic finding in Englewood V that Englewood had not sought any other outside financing. Englewood was losing money every year it was in business, and thus there was no indication to us that Englewood would be able to get the money necessary to actually fix this stuff up. Although the Court made a factual finding that the specific deficiencies identified in the March 2001 REACT report in the 25 units we inspected were easily fixed, there was never a finding that they actually were fixed. That's what HUD was contractually entitled to, was to actually have the deficiencies we found fixed, and for them then to go back. I thought she said that they were fixed. She found that most of them were fixed, and the ones that had not been fixed, she said, could have easily been corrected and paid for out of operating funds. Well, if that's true, then why did they need financing? They needed financing because, as Englewood's principal testified at trial, the loan payments to CIC were quote-unquote deadly. They had a mortgage with CIC that required substantial principal and interest payments every month. A large portion of what they were paying, the revenue they were receiving was simply going into meeting that. In addition, there were just a number of other costs that were eating up all of their revenue. These costs were for, they were trying to increase security, they could never get the elevators working correctly, and a number of other items that they just couldn't get right. It sounds as though you're challenging her finding of fact here, right? What we're challenging specifically is first, throughout, in the subsequent Englewood opinions, she said that the breach was HUD not giving Englewood's new management and new owners sufficient time to cure the default. No, no, but she also made findings about their curing the deficiencies that had been identified and doing what they were supposed to in the light of the March report. The problem is you kind of ignored that in the opening brief, and that's the heart of the problem here. Her findings regarding Englewood's actions do not address the fact that they never actually made it in decent, safe, and sanitary conditions. That was what the contractual requirement was. As the addendum to the contract said, the time period for Englewood to get it in decent, safe, and sanitary condition was to be determined by HUD. We gave them 30 days, yet in May, they still had not gone through and inspected all the units to find out what other deficiencies there were. They hadn't given us the reassurance that yes, these tenants are being protected. But we didn't terminate the contract then. We only issued a continuing notice of default and said, okay, we'll correct those deficiencies or submit a completed loan package. And yet in June, nothing had happened. In July, the only thing that happened was that the city of Chicago declared the building to be a public nuisance. In August, nothing had changed. And finally in September, nothing had changed. Thus, 175 days after we had issued the notice of default, nothing had changed. The court never made any findings that the deficiencies had actually been fully corrected. The court never made a finding that there had been a subsequent inspection after the March 2001 REACT report to find out what other deficiencies existed. And there was no new ownership, no new management. As the court actually found in its Englewood III opinion, the fact is that the new management only came on board on December 1, 2001, the day after HUD had already given its notice to terminate and abate the contract. Thus, their finding, her specific finding of HUD's breach, that we had not given new management and new ownership sufficient time to show that they could improve the project, is contradicted by our factual findings that they didn't even have new management until we had already given the notice of intent to terminate and abate. Also, with regards to the amount of damages, if I could turn to the issue of $3.3 million. The court correctly identified the legal standard when she said that in an expectancy damages case, the proper measure is lost profits. The court, however, then proceeded to award Englewood a measure of gross lost revenue by subtracting the amount Englewood actually received from the amount it would have received had the HAP contract been fully performed. This is error. As the Fifth Circuit has found in 11-line, lost profits can hardly be shown for an entity that never had any profits to begin with. Englewood consistently lost money every year it operated itself, even when the HAP contract was fully performed. Additionally, in order to get those payments, it wasn't a lump sum payment. Those payments had to be made every month. To get the payment, therefore, you need to be making the monthly expenses. You need to pay the mortgage, you need to pay the taxes, you need to pay the insurance. It's uncontested that once it defaulted on its CIC mortgage in May 2002, Englewood never made a mortgage payment. We then refinanced the loan in December 2002, and then they never made a mortgage payment for 2003 or 2004. Before you sit down, could you address their contention about the inconsistent findings with respect to the lost equity? With respect to lost equity? Is there an inconsistent finding here? And if so, where does the first finding appear? They contend that she made inconsistent findings about whether they could survive without the HAP contract. And we've talked about where she made the lack of foreseeability finding. They say that she made another finding in some other opinion that the default and loss of the property was foreseeable. Is that true? It is not true. The finding regarding the foreseeability that the loss of the HAP contract would lead to loss of revenue under the HAP contract, that was the finding to which they're referring. The other issue, the finding regarding foreseeability, is based on the actions of all the principals. Where's the earlier finding that they say is inconsistent? Where do I find that? The earlier finding to which they're referring, I believe they were citing to the page they cited in the Englewood 5 decision, which was focusing on the lost revenue. Where is that? That is, I believe that was in the back of the plaintiff's opening brief, in their addendum. It starts right after the blue page in their opening brief. Well, for example, the opinion that they're referring to on the page that they gave says, if Englewood was having difficulty, even while it was receiving HAP payments, then it should have been foreseeable to the defendants that Englewood would not be able to survive without them. That's one of her express findings. How is that not a finding of foreseeability? I know that I'm into my rebuttal time, but... Please answer. Okay. It's not a finding of foreseeability with regards to the actual loss of South Point, because South Point had the other means. It should have been foreseeable to the defendants that Englewood would not be able to survive without them. Without them. Then it's the HAP payments. Right. But Englewood also could receive voucher tenants. Once you lose your HAP contract, you can then receive tenants, people who meet the Section 8 guidelines, who have a voucher, which they can then use at the other buildings. Thus, in the Schneider memo to which they refer, it doesn't say they need the HAP contract. It says that they need deep subsidization, and that can be done through vouchers. Well, she doesn't say anything about that, but she goes on in concluding this whole section to say, therefore, the court finds it was reasonably foreseeable to the defendant that by breaching the HAP contract, it would cause the plaintiff to lose money it otherwise would have earned with the HAP contract in place. Right. So it doesn't say that it was reasonably foreseeable that they would lose the entire building. Well, it does earlier when it says they couldn't survive without them. It says that. If you can't survive, I'm pretty sure that's ultimate doom. We would then go back to the later findings of the court, and specific regards to lost equity,  with the actions of Hodden insuring the loan, Englewood in taking the loan out, but also in the form of DSSA New Englewood Terrace LLC, which chose on December 13, 2002, to purchase Englewood, despite the fact that the contract had been totally terminated at that point. DSSA New Englewood Terrace LLC chose at that point to step into these issues and buy the liabilities of South Point. Additionally, the Illinois Housing Development Authority also chose to make another loan. So we'd have four different entities, each of whom were saying that no, we don't think this project is doomed. Thank you, Mr. Bowen. We will give you two minutes for rebuttal on your cross-appeal if Mr. Murray talks about the cross-appeal so you have something to rebut. Yes, sir. Mr. Murray has a fair amount of time, six minutes. Thank you, Your Honor, and may it please the Court, the site that I promised Judge Dyke is at page 11, the red brief appendix, the bottom is not numbered, but it's page 11 of the second opinion. Page 11 of the red brief appendix? The second opinion in the red brief appendix. Behind the blue page, there's a first opinion and a second one. Okay, so you say she made inconsistent findings about foreseeability. Did she make inconsistent findings about causation and the failure of proof with respect to the amount of any lost equity? So we believe, no, to answer your question, no. We believe that the causation point here is wrapped up with foreseeability. If it's foreseeable that the building cannot survive without these payments, then taking away these payments causes that result. Absolutely, as night follows day, when these payments were taken away, the CIC foreclosure happened and would have gone to completion, but for Englewood taking advantage of Ed Hinsberger's lifeline, which turned out not to work. This was a building that couldn't survive without some of the payments. Well, but she's making findings that causation was affected by the new financing and what happened there, and that there was a chain of causation which was kind of attenuated by the time you got to the actual foreclosure, right? Absolutely, Your Honor. And we believe, even under a clear error standard, that to take that mitigation effort and think of it as a break in the chain of causation misapprehends the standard for proof of damages. All that needed to be foreseeable at the time of the breach was this kind of damage, which is that without subsidy payments, the building would not survive. So why was she wrong on the third finding about the failure to prove the amount of the equity? Sure, Your Honor. Like I said, this is not a standard HUD case where you don't have proof. We actually had an MIA appraisal, and we think that even under a clear error standard, there was a sufficient amount of proof here to justify the value, and here's why. The MIA appraisal, which was done at the time of the breach, set out three different ways to calculate fair market value. HUD didn't bring any witnesses to trial to challenge that. All they had was the commentary contemporaneous from a HUD inspector who said that one of those three methodologies, the income capitalization methodology, was off because we were using too low of payments. We brought a fleet of witnesses to trial that said, no, that number for the payments was right. We had two years of extreme. What Mr. Sandelson was trying to do was to make this property an example for the nation. And so to do that, you need to get the drug dealers out. You need to get the graffiti out. What did she say about the appraisal? Excuse me, Your Honor. What did the judge say about the appraisal? She said that the HUD witness discounted two of the methods used, which isn't quite true. He didn't. And that as the third, he had these criticisms, which is true. But if you look at the vast weight of the evidence, we had witnesses at trial. They didn't. They had this one guy picking nits. We countered all of those, even under a clear error standard. So she believed the government witness? She did. Well, there was no government witness to believe. She believed the document. There was no witness at trial on this. We had all the witnesses. We backstopped that, not only with an actual appraisal, but with what we paid for it as a check and with a comparable that HUD itself had used as a comparable right down the street in setting rents for this place. And all of those came up with a number, which is in the same ballpark and would have given us lost equity in the amount of approximately $4 million. Even the government's own witnesses would give you a lost equity number of almost a million dollars, which is certainly a lot more than zero. So we believe even as to proceed. What do you mean they would have given? Even the government's, and we set this out in our brief, the government admitted an equity value of $863,223. While they contested our higher value, even they didn't disagree with that. Their position was that. What did the judge say about that? She said that the values were too disparate and she couldn't pick one, so she wasn't. We believe that she applied too rigorous of a standard. This court's cases are clear that in measuring contract damages, you can't have biblical certainty. You have to do the best you can. And we think we certainly, with an appraisal and these two backstop efforts, did more than was required to justify that. I don't know if the court has any other questions. No, apparently not. Thank you, Mr. Murray. Thank you, Roger. I don't think there was anything to rebut on the cross, so we will take the case under advisement. Thank you.